## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RYAN GILARDY, Derivatively on Behalf of Nominal Defendant BEYOND MEAT, INC., | Case. No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| ETHAN BROWN, MARK J. NELSON, PHILLIP E. HARDIN, SETH GOLDMAN, SALLY GRIMES, COLLEEN JAY, RAYMOND J. LANE, MUKTESH PANT, NED D. SEGAL, and KATHY N. WALLER, | |
| Defendants, | |
| and | |
| BEYOND MEAT, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his/her undersigned counsel, Plaintiff Ryan Gilardy ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Beyond Meat, Inc. ("Beyond Meat" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) breach of fiduciary duty for insider trading; (iv) unjust enrichment; and (v) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Beyond Meat and other related

parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Beyond Meat's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Retail Wholesale Department Store Union Local 338 Retirement Fund v. Beyond Meat Inc.*, *et al.* Case No. 23-cv-3602 (the "Related Securities Action"); and (e) review of other publicly-available information concerning Beyond Meat and the Defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant Beyond Meat against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately May 5, 2020 to the present (the "Relevant Period").[1]

2.      Beyond Meat is a Los Angeles-based producer of plant-based meat substitutes. This matter arises from Defendants' material misrepresentations and omissions concerning the Company's ability to produce plant-based meats at scale to the specifications of its key customers, who the Company refers to as "partners."

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately May 5, 2020 to October 13, 2022; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

3.      Throughout the Relevant Period, Beyond Meat misled investors by boasting about the success of its product tests with its large-scale partnerships, including prominent food retailers like McDonalds, Starbucks, KFC, Pizza Hut, and Taco Bell. Beyond Meat assured investors and partners that it would "ensure manufacturability" through "extensive testing," and that it was capable of manufacturing the unique plant-based meat products at commercial scale. Further, Beyond Meat blamed any delays in launching these large-scale partnerships on Covid-19.

4.      Certain Beyond Meat executives profited enormously from the scheme described herein by selling hundreds of thousands of shares of their personally held Company stock at artificially inflated prices during the Relevant Period. For instance, Defendant Nelson sold 442,252 shares of Beyond Meat stock during the Relevant Period for over $58.3 million in proceeds.

5.      The truth began to emerge on October 22, 2021, when Beyond Meat announced that the Company was reducing its third quarter net revenues outlook by up to $34 million, or 25%. As part of the announcement, Beyond Meat also revealed that the Company's expenses and inventories were continuing to rise. As a result of these disclosures, the price of Beyond Meat stock declined by $12.82 per share, or nearly 12%, from $108.62 per share to $95.80 per share.

6.      Then, on November 10, 2021, Beyond Meat announced a $1.8 million write-off of unsold inventory. As a result of this disclosure, the price of Beyond Meat stock declined by $12.55 per share, or nearly 13%, from $94.48 per share to $81.93 per share.

7.      However, Beyond Meat continued to assure investors of the success of its partnerships. For example, on November 10, 2021, Defendant Brown claimed that the Company "overcame numerous technical challenges" and blamed its poor financial results on the Covid-19 pandemic.

8.     Then, on November 17, 2021, an article was published in *Bloomberg* highlighting the delays in production and execution challenges Beyond Meat was facing. Former employees reported that there were "significant internal problems" stemming from "confusion and misalignment . . . [and] belated decision-making" that corresponded with exacerbated production delays. As a result of these disclosures, the price of Beyond Meat stock declined by $3.01 per share, or more than 3.5%, from $83.48 per share to $80.97 per share.

9.     On December 9, 2021, after the market closed, multiple media sources reported that Taco Bell had cancelled a planned product test due to ongoing quality concerns. As a result of these disclosures, the price of Beyond Meat stock declined by $5.58 per share, or nearly 8%, from $70.09 per share to $64.51 per share.

10.     On October 14, 2022, Beyond Meat announced the departure of several top executives, including the Company's Chief Operating Officer, Chief Growth Officer, and Chief Financial Officer. As a result of these disclosures, the price of Beyond Meat stock declined by $1.43 per share, or over 9.6%, from $14.78 per share to $13.35 per share.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, the Company and its shareholders have been damaged.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §§ 14(a) and 10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

15.     Plaintiff has been a shareholder since prior to the start of the Relevant Period, is currently, and at all relevant times has been, a holder of Beyond Meat common stock.

16.     Nominal Defendant Beyond Meat is incorporated in Delaware and its current principal executive offices are located at 888 North Douglas Street, Suite 100, El Segundo, California, 90245. The Company's common stock trades on the NASDAQ under ticker symbol "BYND."

17.     Defendant Ethan Brown ("Brown") has served as the President and Chief Executive Officer ("CEO") of Beyond Meat since founding the Company in 2009. Defendant Brown is a director of the Board. For the fiscal years of 2020, 2021, and 2022, Defendant Brown received $5,333,325, $6,572,625, and $6,770,871 in total compensation, respectively.

18.     Defendant Mark J. Nelson ("Nelson") served as Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and Treasurer of Beyond Meat from December 2015 to May 2021. For the fiscal years of 2020 and 2021, Defendant Nelson received $2,871,897 and $239,350 in total compensation, respectively.

19.     Defendant Phillip E. Hardin ("Hardin") served as CFO of Beyond Meat from July 2021 to October 2022. For the fiscal years of 2021 and 2022, Defendant Hardin received $4,840,623 and $3,587,734 in total compensation, respectively.

20.     Defendants Brown, Nelson, and Hardin, are collectively referred to herein as the "Securities Action Defendants."

21.     Defendant Seth Goldman ("Goldman") has served as a director of the Board since February 2013. Defendant Goldman is Chair of the Board and a member of the Nominating and Corporate Governance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Goldman received $235,738, $154,900, and $135,907 in total compensation, respectively.

22.     Defendant Sally Grimes ("Grimes") has served as a director of the Board since May 2021. Defendant Grimes is Chair of the Nominating and Corporate Governance Committee and a member of the Risk Committee. For the fiscal years of 2021 and 2022, Defendant Grimes received $276,573 and $111,539 in total compensation, respectively.

23.     Defendant Colleen Jay ("Jay") has served as a director of the Board since May 2022. Defendant Grimes is Chair of the Risk Committee and a member of the Audit Committee. For the fiscal year of 2022, Defendant Jay received $260,601 in total compensation, respectively.

24.     Defendant Raymond J. Lane ("Lane") has served as a director of the Board since February 2015. Defendant Lane is a member of the Human Capital Management and Compensation Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Lane received $191,939, $140,400, and $121,407 in total compensation, respectively.

25.     Defendant Muktesh Pant ("Pant") has served as a director of the Board since May 2021. Defendant Pant is Chair of the Human Capital Management and Compensation Committee and a member of the Nominating and Corporate Governance Committee. For the fiscal years of 2021 and 2022, Defendant Pant received $282,837 and $121,407 in total compensation, respectively.

26.     Defendant Ned D. Segal ("Segal") has served as a director of the Board since November 2018. Defendant Segal is a member of the Audit Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Segal received $186,439, $134,900, and $115,907 in total compensation, respectively.

27.     Defendant Kathy N. Waller ("Waller") has served as a director of the Board since November 2018. Defendant Waller is Chair of the Audit Committee and a member of the Human Capital Management and Compensation Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Waller received $199,439, $149,153, and $130,907 in total compensation, respectively.

28.     Defendants Goldman, Grimes, Jay, Lane, Pant, Segal, and Waller, are collectively referred to herein as the "Director Defendants."

29.     Related Party Non-Defendant C. James Koch ("Koch") has served as a director of the Board since May 2023. Koch is named solely for purposes of demand futility.

30.     The Director Defendants, along with the Securities Action Defendants are referred to herein collectively as the "Individual Defendants."

31.     Defendant Beyond Meat, along with the Individual Defendants, are referred to herein collectively as the "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers, directors, and/or fiduciaries of Beyond Meat, and because of their ability to control the business and corporate affairs of Beyond Meat, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Beyond Meat in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Beyond Meat and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.     Each director and officer of the Company owes to Beyond Meat and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

34.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

35.     Pursuant to the Audit Committee Charter of Beyond Meat (amended as of December 16, 2022),[2] the purpose of the Audit Committee is to:

> …(A) assist the Board in overseeing (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the Company's internal audit function and independent auditors; (B) provide such reports as may be required of an audit committee under the rules and regulations promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and (C) provide oversight with respect to ethical conduct and any related matters. The Committee is not responsible, however, for planning or conducting audits, or determining whether the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles ("GAAP").

36.     The responsibilities of the Audit Committee include the following, among others:

1.     Appoint and provide for the compensation of a "registered public accounting firm" (as that term is defined in Section 2(a) of the Sarbanes-Oxley Act of 2002) to serve as the Company's independent auditor, oversee the work of the

---

[2] Available at https://investors.beyondmeat.com/static-files/48d288c3-b6c5-4a6f-b997 -dd6f9a07d6a0.

independent auditor (including resolution of any disagreements between management and the independent auditor regarding financial reporting), evaluate the performance of the independent auditor and, if so determined by the Committee, replace the independent auditor.

2.      Review the plan for and the scope of the audit and related services at least annually.

3.      Approve, in accordance with Sections 10A(h) and (i) of the Exchange Act, the Regulations and the Auditing Standards of the Public Accounting Oversight Board (the "PCAOB"), all professional services, to be provided to the Company by its independent auditor, provided that the Committee shall not approve any non-audit services proscribed by Section 10A(g) of the Exchange Act in the absence of an applicable exemption. The Committee may adopt policies and procedures for the approval of such services which may include delegation of authority to a designated member or members of the Committee to approve such services so long as any such approvals are disclosed to the full Committee at its next scheduled meeting.

4.      At least annually, obtain and review a report by the independent auditor describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (to assess the auditor's independence) all relationships between the independent auditor and the Company. Ensure the receipt of, and evaluate the written disclosures and the letter that the independent auditor submits to the Committee regarding the auditor's independence in accordance with applicable requirements of the PCAOB regarding the independent accountant's communications with the audit committee concerning independence, discuss such reports with the auditor, oversee the independence of the independent auditor and, if so determined by the Committee in response to such reports, take appropriate action to address issues raised by such evaluation or recommend such action to the full Board.

5.      Discuss with the independent auditor the matters required to be discussed by the auditing standards of the PCAOB.

6.      Discuss with the independent auditor, management and internal audit staff or others responsible for the internal audit function the Company's financial risk assessment and financial risk management guidelines, policies and processes.

7.      On behalf of the Board, oversee the principal financial risk exposures facing the Company and the Company's mitigation efforts in respect of such risks, including, but not limited to financial reporting risks and credit and liquidity risks.

8.      Review with management any significant changes to GAAP, SEC and other accounting policies or standards that will impact or could impact the financial reports under review.

9.      Review significant changes to the Company's accounting principles and practices proposed by the independent auditor or management.

10.     Instruct the independent auditor to report to the Committee on all critical accounting policies of the Company, any significant adjustments, management judgment and accounting estimates, critical audit matters addressed during the audit, significant new accounting policies, all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor, and other material written communication between the independent auditor and management, and discuss these matters with the independent auditor and management.

11.     Meet with management, the independent auditor and internal audit staff or others responsible for the internal audit function to discuss the annual financial statements, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein, and the report of the independent auditor with respect to such annual financial statements and to discuss significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; access to required information; the adequacy of internal controls, including any special steps adopted in light of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting identified during the course of the annual audit, and the adequacy of disclosures about changes in internal control over financial reporting; the adequacy of the disclosure of off- balance sheet transactions, arrangements, obligations and relationships in reports filed with the Securities and Exchange Commission (the "SEC"); and the appropriateness of the presentation of any non-GAAP financial measures (as defined in the Regulations) included in any report filed with the SEC or in any public disclosure or release.

12.     Recommend to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K based on the Committee's review and discussions (a) with management of the audited financial statements, (b) with the independent auditor of the matters required to be discussed by the PCAOB and the SEC and (c) with the independent auditor concerning the independent auditor's independence.

13.     Provide a report in the Company's proxy statement in accordance with the rules and regulations of the SEC.

14.     Periodically receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

15.     Review and discuss with the independent auditor, management and internal audit staff or others responsible for the internal audit function their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation.

16.     Discuss any comments or recommendations of the independent auditors outlined in their annual management letter or internal control reports. If appropriate, approve a schedule for implementing any recommended changes and monitor compliance with the schedule.

17.     Review, prior to public release, the substance and presentation of financial information (including any guidance) in the Company's annual and quarterly earnings releases.

18.     Oversee the activities of the internal audit function within the Company. Review and approve the annual internal audit plan, including the scope and procedures to be used for the year and any modifications to the plan during the year. Review significant issues and significant, unsatisfactory audit findings identified by the internal audit staff or others responsible for the internal audit function and management's response and follow up to such issues. Establish and annually review and approve changes (if any) to the internal audit charter.

19.     Discuss with management and the independent auditor the quarterly financial statements prior to the filing of the Form 10-Q, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein; provided that this responsibility may be delegated to the chairman of the Committee or a member of the Committee who is a financial expert.

20.     Periodically conduct separate executive sessions with management, the independent auditor and internal audit staff or others responsible for the internal audit function to discuss matters that any of them or the Committee believes could significantly affect the financial statements and should be discussed privately; and review with the independent auditor any audit problems or difficulties and management's response, including any restrictions on the scope of the independent auditor's activities or access to requested information, or any significant disagreements with management.

21.     Evaluate the qualifications, performance and independence of the lead audit partner and, if so determined by the Committee, recommend replacement or rotation of the lead audit partner.

22.     Conduct or authorize such inquiries into matters within the Committee's scope of responsibility as the Committee deems appropriate.

23.     Establish a procedure for receipt, retention and treatment of any complaints received by the Company about its accounting, internal accounting controls or auditing matters and for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

24.     Review and oversee procedures designed to identify "related party" transactions that are material to the Company's consolidated financial statements or otherwise require disclosure under applicable laws and rules adopted by the SEC. The Committee shall have the authority to approve any such "related party" transactions.

25.     Review and assess conflicts of interest under the Company's code of business conduct and ethics.

26.     Review and assess the Company's policies on corporate communications, insider trading and anti-corruption.

27.     Engage and terminate independent counsel and other advisers as the Committee determines necessary to carry out its responsibilities and approve the fees and service terms of such advisors.

28.     Cause the officers of the Company to provide such funding as the Committee shall determine to be appropriate for payment of compensation to the Company's independent auditor and any legal counsel or other advisers engaged by the Committee, and payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

29.     Set policies regarding the hiring by the Company of current or former employees of the Company's independent auditors.

30.     Review reports and recommendations from the Risk Committee on risk-related issues and, in conjunction with the Risk Committee, determine whether and how such risks or incidents should be disclosed in the Company's periodic filings with the SEC.

31.     Review cybersecurity risks and incidents and any other risks and incidents relevant to the Company's computerized information system controls and security, and determine if any such risks and incidents should be disclosed in the Company's periodic filings with the SEC.

32.     Assist the Risk Committee and Chief Legal Officer in an annual review and assessment of the Company's code of business conduct and ethics and recommend changes for approval by the Board, and assist the Risk Committee and Chief Legal

Officer in monitoring compliance with the Company's code of business conduct and ethics.

33.     Review with the full Board, any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, and the performance and effectiveness of the internal audit function.

34.     Perform such other activities and functions as are required by law, the Listing Rules or provisions in the Company's charter documents, or as are otherwise necessary and advisable, in its or the Board's discretion, to the efficient discharge of its duties hereunder.

*          *          *

**Periodic Review**

The Committee will periodically, but no less frequently than annually, review its own composition and performance and report on its conclusions in this regard to the Board. In addition, the Committee will annually review this Charter and make recommendations to the Board with regard to appropriate changes to the Charter

### Duties Pursuant to the Company's Code of Conduct

37.     The Individual Defendants, as officers and/or directors of Beyond Meat, were also bound by the Company's Code of Conduct (the "Code") (adopted and approved on November 15, 2018)[3] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Beyond Meat, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

38.     Regarding basic general principles of conduct, the Code requires that:

…all of its directors, executives, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of commitment to this Code among its

---

[3]     Available at https://investors.beyondmeat.com/static-files/2279632c-1e77-4cbd-9f2b-4bd937fe3bae.

employees and foster a culture of fairness, honesty and accountability within the Company. The Company also expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf.

39.      Concerning compliance with laws and regulations, the Code states that:

Directors and employees must always obey the law while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that all employees know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. See Section 19 (Compliance Standards and Procedures) for a description of whom to contact with questions about legal compliance.

40.      Concerning insider trading, the Code states that:

Every director and employee is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, the Company's Insider Trading Policy (the "Insider Trading Policy") and other Company policies, to tip or to trade on inside information. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Company business.

Employees must exercise the utmost care when in possession of material nonpublic information. The Insider Trading Policy provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how an employee may purchase or sell shares of Company stock or other Company securities.

Please review the Insider Trading Policy for additional information.

41.      Concerning conflicts of interests, the Code states that:

Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict. A "conflict of interest" occurs when a personal interest

interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole.

Sometimes conflicts of interest arise when an employee takes some action or has some outside interest, duty, responsibility or obligation that conflicts with an interest of the Company or the employee's duty to the Company. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform the employee's duties objectively and effectively. Conflicts of interest can also arise when an employee or relative of an employee (including a family member of an employee) receives improper personal benefits as a result of the employee's position at the Company.

In evaluating whether an actual or contemplated activity may involve a conflict of interest, employees should consider:

- whether the activity would appear improper to an outsider;

- whether the activity could interfere with an employee's job performance or morale or that of another Company employee; whether the employee has access to confidential Company information or influence over significant Company resources or decisions;

- the potential impact of the activity on the Company's business relationships, including relationships with business partners and service providers;

- the extent to which the activity could benefit the employee or the employee's relatives, directly or indirectly;

- any overlap between the employee's specific role at the Company; and

- whether the investment is in a publicly traded or non-publicly traded company.

A few examples of activities that could involve conflicts of interests include:

- **Aiding the Company's competitors.** This could take the form of service as a member of the board of directors of a competitor, passing confidential Company information to a competitor or accepting payments or other benefits from a competitor. If employees are concerned about whether an interaction with a competitor constitutes a conflict of interest they should consult with their supervisor and the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer.

- **Involvement with any business that does business with the Company or seeks to do business with the Company.** Employment by or service on the board of directors of a business partner, supplier or service provider is

generally discouraged, and an employee (other than a director) must seek authorization from the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer in advance if the employee plans to have such a relationship. A director must consult with the Audit Chair (or, in the case of the Audit Chair, the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer) if the director plans to have such a relationship.

- **Owning a significant financial interest in a competitor or a business that does business with the Company or seeks to do business with the Company.** In evaluating such interests for conflicts, both direct and indirect interests that employees or their relatives may have should be considered, along with factors such as the following:

  o the size and nature of the interest; o the nature of the Company's relationship with the other business;

  o whether an employee has access to confidential Company information; and

  o whether an employee has an ability to influence Company decisions that would affect the other entity.

If a director has or wishes to acquire a significant financial interest in a competitor, or in a business partner, supplier or service provider with which the director has direct business dealings (or approval responsibilities), the director must consult with the Audit Chair (or, in the case of the Audit Chair, the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer). If an employee has or wishes to acquire a significant financial interest in a competitor, or in a business partner, supplier or service provider with which the employee has direct business dealings (or approval responsibilities), the employee must consult with the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer. Similarly, if an employee experiences a change of position or seniority that results in having direct business dealings with a business partner or service provider in which the employee already has a significant financial interest, the employee must consult with the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer.

- **Soliciting or accepting payments, gifts, loans, favors or preferential treatment from any person or entity that does or seeks to do business with the Company.** See Section 10 (Gifts and Entertainment) for further discussion of the issues involved in this type of potential conflict.

- **Taking personal advantage of corporate opportunities.** See Section 7 (Corporate Opportunities) for further discussion of the issues involved in this type of conflict.

- **Having authority on behalf of the Company over a co-worker who is also a family member, or transacting business on behalf of the Company with a family member.** If employees may be involved in such situations, they should consult with their supervisors and the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer to assess the situation and determine an appropriate resolution.

Employees must avoid these situations (and others like them), and any other situations where their loyalty to the Company could be compromised. If an employee (other than a director) believes that the employee is or may become involved in a potential conflict of interest, the employee must discuss it with, and seek a determination and prior authorization or approval from, the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer. If a director believes a situation may exist in which the director has a conflict of interest that would interfere with the ability to perform the director's responsibilities as a director, the director must promptly notify the Audit Chair (or, in the case of the Audit Chair, the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer). In such a scenario, the Audit Committee, acting where appropriate on the advice and guidance of counsel, will review all relevant facts and may (i) determine that the conduct or situation does not amount to a conflict of interest, (ii) provide guidance to avoid a conflict from developing (such as suggesting recusal from consideration and/or approval of specific matters that come before the Board) or (iii) declare that the director may not pursue a certain course of action, or must terminate the conflict. In addition, all relatedparty transactions, whether or not deemed to be a conflict of interest, must be approved in accordance with the Company's Related-Party Transactions Policy.

<u>Special Note Regarding Employee Loans</u>

Loans to employees or their family members by the Company, or guarantees of their loan obligations, could constitute an improper personal benefit to the recipients of these loans or guarantees. Accordingly, Company loans and guarantees for executive officers and directors are expressly prohibited by law and Company policy. In addition, approval of the Human Capital Management and Compensation Committee of the Board is required for any Company loan to any other employee.

42.     Concerning corporate opportunities, the Code states that:

Employees may not compete with the Company or take personal advantage of business opportunities that the Company might want to pursue. Employees are prohibited from taking for themselves personally (or for the benefit of friends or family members) opportunities that are discovered through the use of Company property, information or position. Even opportunities that are acquired through

independent sources may be questionable if they are related to the Company's existing or proposed lines of business.

No employee may use Company property, information or position for personal gain. Employees owe a duty to the Company to advance the Company's legitimate business interests when opportunities arise. Accordingly, participation by employees in outside business opportunities that are related to the Company's existing or proposed lines of business is prohibited.

Directors should consult with the Audit Chair (or, in the case of the Audit Chair, the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer) and employees (other than directors) should consult with the Chief Legal Officer or, if there shall be no Chief Legal Officer, the Chief Financial Officer, in each case, to determine an appropriate course of action if interested in pursuing an opportunity that they discovered through their Company position or use of Company property or information.

43.     Concerning public reporting of the Company's financial records, the Code states

that:

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

- no entry be made in the Company's books and records that is intentionally false or misleading;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

- employees comply with the Company's system of internal controls and be held accountable for their entries;

- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the U.S. Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;

- comply with this Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

If an employee becomes aware that the Company's public disclosures are not complete, fair and accurate, or if an employee becomes aware of a transaction or development that the employee believes may require disclosure, the employee should report the matter immediately.

44. Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

45. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Beyond Meat, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Beyond Meat.

20

46.     Because of their advisory, executive, managerial, and directorial positions with Beyond Meat, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Beyond Meat.

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Beyond Meat, and was at all times acting within the course and scope of such agency.

## Reasonable and Prudent Supervision

48.     To discharge their duties, the officers and directors of Beyond Meat were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Beyond Meat were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Beyond Meat conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable

inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Beyond Meat was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

49.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Beyond Meat and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Beyond Meat, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Beyond Meat, the absence of good faith on their part, and a reckless disregard for their duties to Beyond Meat and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Beyond Meat.

50.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

51.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Beyond Meat has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

54.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

55.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

57.     Beyond Meat is a global producer of plant-based meat substitutes such as Beyond Burgers, Beyond Sausages, Beyond Meatballs, and Beyond Pepperoni, based in El Segundo, California. Founded in 2009, Beyond Meat seeks to build "meat directly from plants" by faithfully replicating the look, taste, and texture of animal meat using only vegan, non-genetically modified ingredients.

58.     Beyond Meat found success creating small, sample-sized prototypes of its product offerings, and received immense support from venture funding and celebrity investors. The Company went public in 2019 as the best-performing IPO in nearly two decades, with shares surging more than 163% in the first day of trading.

59.     On the heels of its IPO, Beyond Meat announced numerous high-profile partnerships with foodservice providers, including Starbucks, McDonalds, KFC, Pizza Hut, and Taco Bell. According to a Company spokesperson, during these pitches Beyond Meat would "show foodservice customers prototypes to illustrate the art of the possible." The Company also assured investors that all new products are subject to Beyond Meat's "extensive" testing programs, in order to ensure not only the quality and fidelity of its products, but also that products are "qualified through trials to ensure manufacturability."

### Defendant's Materially False and Misleading Statements

60.     The Relevant Period begins on May 5, 2020, when Beyond Meat participated in its first quarter 2020 earnings conference call with analysts and investors. During that call, Beyond

Meat presented several new and expanded partnerships, including a limited test with McDonald's Canada that ran from January to April 2020.

61.     On that same conference call, in response to a question of why the test ended in April without a widespread product launch, Defendant Brown stated, "for no negative reason at all. . . . [W]e feel very good about our relationship with McDonald's and what's going to be happening both there and potentially elsewhere." When pushed further to explain why the test ended instead of expanding, Defendant Brown responded, "I can assure you there's no issue with McDonald's" and "there's been no change in information since we began this test and got good results in the beginning and got good results at the end."

62.     On June 10, 2020, Defendant Brown represented Beyond Meat at the William Blair Growth Stock Conference. At the conference, Defendant Brown was asked for an update on the McDonald's test and potential launch. In response, Defendant Brown reiterated that "we had a very positive test with them. . . . I remain very optimistic about our business in foodservice." In addition, Defendant Brown touted recent tests with Pizza Hut, Taco Bell, and KFC, claiming "it was a terrific launch" and "the tests are going well, went well." Defendant Brown also stated, "our goal is to . . . provide the benefits from a nutritional perspective of meat to the consumer. So you get taste right, you get nutrition right, so you're providing superior nutritional value proposition, and then you drop price below animal protein."

63.     On November 9, 2020, Beyond Meat held its third quarter 2020 earnings conference call with analysts and investors. On that call, analysts asked Defendant Brown for an update on Beyond Meat's foodservice segments. Again, Defendant Brown claimed that testing remained ongoing at foodservice providers, including Pizza Hut and Taco Bell. Further, Defendants Brown and Nelson each blamed Covid-19 for any delay in full-scale product launches,

25

with Brown claiming "there's [] testing going on, but I think folks are waiting for resumption of full economic activity before they start to really add things into their menu."

64.    On March 1, 2021, Beyond Meat filed its annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2020. The Form 10-K stated that "ingredients in our flavors are qualified through trials to ensure manufacturability" and that "[f]lavors are extensively tested prior to introduction to ensure finished product attributes such as taste, texture, aroma and appearance are not negatively impacted."

65.    The statements above were materially false and misleading. In truth, Beyond Meat was unable to manufacture its meat substitutes at scale to the specifications of its partners. Further, Beyond Meat suffered from widespread scaling issues, particularly misalignment and delayed decision-making, which led to corresponding production delays. Such issues were exacerbated by Beyond Meat's disjointed production lines. These problems led some partners to balk at the high price of Beyond Meat's products and express doubts about the Company's ability to produce them at commercial scale.

66.    On April 9, 2021, the Company filed its Proxy Statement for 2021 (the "2021 Proxy"), which was solicited by Defendants Brown, Goldman, Grimes, Lane, Pant, Segal, and Waller.

67.    The 2021 Proxy solicited shareholder votes to approve: (i) the election of three Class II directors; (ii) ratification of Deloitte & Touche LLP as the Company's independent registered public accounting firm; and (iii) an advisory vote on the frequency of future stockholder advisory votes to approve the compensation paid to Beyond Meat's executives.

68.    However, the 2021 Proxy failed to disclose to investors that Beyond Meat was unable to manufacture its meat substitutes at scale to the specifications of its partners. Further,

Beyond Meat suffered from widespread scaling issues, particularly misalignment and delayed decision-making, which led to corresponding production delays. Such issues were exacerbated by Beyond Meat's disjointed production lines. These problems led some partners to balk at the high price of Beyond Meat's products and express doubts about the Company's ability to produce them at commercial scale. The 2021 Proxy further failed to disclose that the Company's Code of Conduct was not followed, despite assertions to the contrary.

### Disclosure of the Company's Misconduct Caused Significant Investor Losses

69.     On October 22, 2021, Beyond Meat announced that it was reducing its third quarter net revenues outlook from between $120 million and $140 million to just $106 million, a decline of 12% to 25%. As part of the announcement, Beyond Meat also revealed that the Company's expenses were continuing to rise.

70.     As a result of this disclosure, the price of Beyond Meat stock declined by $12.82 per share, or nearly 12%, from a closing price of $108.62 per share on October 21, 2021, to a closing price of $95.80 per share on October 22, 2021.

71.     Then, on November 10, 2021, after the markets closed, Beyond Meat announced a $1.8 million inventory write-off, blaming Covid-19 and product repackaging costs.

72.     As a result of this disclosure, the price of Beyond Meat stock declined by $12.55 per share, or nearly 13%, from a closing price of $94.48 per share on November 10, 2021, to a closing price of $81.93 per share on November 11, 2021.

73.     However, Defendants continued to assure investors of the Company's manufacturing capabilities and the strength of its partnerships. For example, on the November 10, 2021 earnings conference call with analysts and investors, Defendant Brown continued to attribute Beyond Meat's poor financial results and expiring inventory to the Covid-19 pandemic, stating

"there's just unusual consumer behavior . . . whether it's people because of the Delta variant spending less time in the retail markets, being less open to trial in the absence of sampling programs." Defendant Brown also claimed that the Company "overcame numerous technical challenges" in its partnership with Pizza Hut to provide Beyond Pepperoni.

74.     The statements above were materially false and misleading. In truth, Beyond Meat was unable to manufacture its meat substitutes at scale to the specifications of its partners. As a result, Beyond Meat was unable to sell its product and, therefore, amassed unsalable inventory.

75.     One week later, on November 17, 2021, *Bloomberg* published an article highlighting the delays in product roll out and execution challenges Beyond Meat was facing. That article, citing five former Beyond Meat employees, laid bare the Company's ongoing scaling problems and how those problems were tarnishing the Company's relationships with potential partners.

76.     As a result of this disclosure, the price of Beyond Meat stock declined by an additional $3.01 per share, or over 3.5%, from a closing price of $83.48 per share on November 16, 2021, to a closing price of $80.97 per share on November 17, 2021.

77.     Then, on December 9, 2021, after the market closed, multiple media sources reported that Taco Bell had cancelled a planned test of Beyond Carne Asada due to ongoing quality concerns. According to those reports, this cancellation was further evidence of ongoing problems Beyond Meat faced in bringing its products to market at scale.

78.     As a result of this disclosure, the price of Beyond Meat stock declined by $5.58 per share, or nearly 8%, from a closing price of $70.09 per share on December 9, 2021, to a closing price of $64.51 per share on December 10, 2021.

79.     Following these disclosures, Beyond Meat continued to assure investors that its product testing was going well. For example, on February 24, 2022, Beyond Meat participated in its fourth quarter 2021 earnings conference call with analysts and investors. On that call, Defendant Brown stated, "with the resumption of our broader sampling program, this period of delay appears to be coming to an end, and several products are in various stages of market entry or expansion."

80.     Then, on March 2, 2022, Beyond Meat filed its annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2021. The Form 10-K again stated that "ingredients in our flavors are qualified through trials to ensure manufacturability" and "[f]lavors are extensively tested prior to introduction to ensure finished product attributes such as taste, texture, aroma and appearance are not negatively impacted."

81.     The statements above were materially false and misleading. In truth, Beyond Meat was unable to manufacture its meat substitutes at scale to the specifications of its partners. Further, Beyond Meat suffered from widespread scaling issues, particularly misalignment and delayed decision-making, which led to corresponding production delays. Such issues were exacerbated by Beyond Meat's disjointed production lines. These problems led some partners to balk at the high price of Beyond Meat's products and express doubts about the Company's ability to produce them at commercial scale.

82.     On April 12, 2022, the Company filed its Proxy Statement for 2022 (the "2022 Proxy"), which was solicited by Defendants Brown, Goldman, Grimes, Lane, Pant, Segal, and Waller.

83.     The 2022 Proxy solicited shareholder votes to approve: (i) the election of three Class III directors; (ii) ratification of Deloitte & Touche LLP as the Company's independent

registered public accounting firm; and (iii) an advisory vote on the frequency of future stockholder advisory votes to approve the compensation paid to Beyond Meat's executives.

84.     However, the 2022 Proxy failed to disclose to investors that Beyond Meat was unable to manufacture its meat substitutes at scale to the specifications of its partners. Further, Beyond Meat suffered from widespread scaling issues, particularly misalignment and delayed decision-making, which led to corresponding production delays. Such issues were exacerbated by Beyond Meat's disjointed production lines. These problems led some partners to balk at the high price of Beyond Meat's products and express doubts about the Company's ability to produce them at commercial scale. The 2022 Proxy further failed to disclose that the Company's Code of Conduct was not followed, despite assertions to the contrary.

## **The Truth Fully Emerges**

85.     On October 14, 2022, before the market opened, Beyond Meat announced the departure of several of its top executives, including the Chief Operating Officer (Doug Ramsey), Chief Growth Officer (Deanna Jurgens), and Chief Financial Officer (Defendant Hardin).

86.     As a result of this disclosure, the price of Beyond Meat stock declined by $1.43 per share, or over 9.6%, from a closing price of $14.78 per share on October 13, 2022, to a closing price of $13.35 per share on October 14, 2022.

## **DEFENDANTS' INSIDER TRADING**

87.     Certain of the Individual Defendants capitalized on the artificially inflated stock price by selling significant portions of their holdings of Company common stock. While in possession of material, adverse, non-public information, Defendants Goldman, Lane, and Nelson (the "Insider Selling Defendants") collectively sold hundreds of thousands of shares of Beyond Meat stock for proceeds of over $92.78 million. These sales made by the Insider Selling

Defendants during the Relevant Period were suspiciously large in quantity and timing and were inconsistent with their pre- and post-Relevant Period trading practices.

88.     Defendant Goldman sold 170,000 shares of his personally held Beyond Meat stock for proceeds of $24,021,230 between August and September 2020.

89.     Defendant Lane sold 78,552 shares of his personally held Beyond Meat stock for proceeds of $10,384,469 in May 2020.

90.     Defendant Nelson sold 690,804 shares of his personally held Beyond Meat stock for proceeds of $58,373,743 in May 2020.

## DAMAGES TO THE COMPANY

91.     Beyond Meat has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Beyond Meat has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

     a.   costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

     b.   substantial loss of market capital;

     c.   costs already incurred and to be incurred defending the Related Securities Action; and

     d.   any fines or other liability resulting from the Company's violations of federal law.

92.     In addition, Beyond Meat's business, goodwill, and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

93.     The wrongdoing complained of herein has irreparably damaged Beyond Meat's corporate image and goodwill.  For at least the foreseeable future, Beyond Meat will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Beyond Meat's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.     Plaintiff brings this action derivatively in the right and for the benefit of Beyond Meat to redress injuries suffered, and to be suffered, by Beyond Meat as a direct result of violations of federal securities laws by the Defendants.  Beyond Meat is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95.     The Board of Beyond Meat, at the time this action was commenced, consisted of Defendants Brown, Goldman, Grimes, Jay, Lane, Pant, Segal, Waller, and Related Party Non-Defendant Koch, a total of nine (9) individuals.

96.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Beyond Meat Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

97.     Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions

and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

98.     Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Brown Because His
Principal Professional Occupation as the Company's President and CEO**

99.     Defendant Brown has served as the President and CEO of Beyond Meat since founding the Company in 2009. Defendant Brown is a director of the Board. For the fiscal years of 2020, 2021, and 2022, Defendant Brown received $5,333,325, $6,572,625, and $6,770,871 in total compensation, respectively. The Company does not claim that Defendant Brown is an independent director, and because his primary source of income and primary employment is his employment as President and CEO of Beyond Meat and his professional reputation is inextricably bound to his role at Beyond Meat, Defendant Brown is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to Defendants
Jay, Segal, and Waller as Audit Committee Members**

100.    Demand is futile as to Defendants Jay, Segal, and Waller (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

101.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The Audit Committee Charter notes that the purpose of the Audit Committee shall be to:

> …(A) assist the Board in overseeing (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the Company's internal audit function and independent auditors; (B) provide such reports as may be required of an audit committee under the rules and regulations promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and (C) provide oversight with respect to ethical conduct and any related matters. The Committee is not responsible, however, for planning or conducting audits, or determining whether the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles ("GAAP").

102.    Specifically, the Audit Committee Charter notes that the Audit Committee is responsible to:

> Review and discuss with the independent auditor, management and internal audit staff or others responsible for the internal audit function their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation.

103.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

104.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the

Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

### Demand is Futile as to Defendants Goldman, Lane, and Nelson

105. Demand is excused as to the Insider Selling Defendants because they directly benefited from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with their illicit insider stock sales detailed above, which were suspicious in timing and amount, and therefore cannot possibly consider a demand to sue themselves based on those transactions in which they reaped significant benefits.

106. As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings during the Relevant Period, each of the Insider Selling Defendants knew the false and misleading statements made through press releases and in the Company's financial statements during the Relevant Period had caused the Company's stock price to become artificially inflated. While in possession of this material adverse non-public information regarding the Company, the Insider Selling Defendants participated in the illegal insider selling set forth herein and thereby received personal financial benefits from the challenged insider trading transactions.

107. The Company has adopted a policy concerning insider trading in the Code, which states:

> Every director and employee is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, the Company's Insider Trading Policy (the "Insider Trading Policy")

and other Company policies, to tip or to trade on inside information. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Company business.

Employees must exercise the utmost care when in possession of material nonpublic information. The Insider Trading Policy provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how an employee may purchase or sell shares of Company stock or other Company securities.

108.    Accordingly, the Insider Selling Defendants have violated the Company's insider trading policies and face a sufficiently substantial likelihood of liability due to their illicit trades, rendering them incapable of considering a demand.

**Demand is Futile as to the Director Defendants**

109.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

110.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

111.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and

36

prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

112.     Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

113.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

115.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

116.     Under the direction and watch of the Individual Defendants, the 2021 and 2022 Proxy Statements (the "Proxy Statements") failed to disclose to investors that Beyond Meat was

unable to manufacture its meat substitutes at scale to the specifications of its partners. Further, Beyond Meat suffered from widespread scaling issues, particularly misalignment and delayed decision-making, which led to corresponding production delays. Such issues were exacerbated by Beyond Meat's disjointed production lines. These problems led some partners to balk at the high price of Beyond Meat's products and express doubts about the Company's ability to produce them at commercial scale. The Proxy Statements further failed to disclose that the Company's Code of Conduct was not followed, despite assertions to the contrary.

117. The Proxy Statements were also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operations and prospects in relation to the conduct alleged herein.

118. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the Company's directors.

119. The Company was damaged as a result of the Individual Defendants material misrepresentations and omissions in the Proxy Statements.

120. Plaintiff on behalf of Beyond Meat has no adequate remedy at law.

## COUNT II

**Against the Securities Action Defendants for
Contribution Under Section 10(b) of the Exchange Act,
<u>Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act</u>**

121.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.     As a result of the conduct and events alleged above, Beyond Meat has been named as a defendant in the Related Securities Action brought on behalf of Beyond Meat shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

123.     Federal law provides Beyond Meat with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Beyond Meat has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Beyond Meat to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

124.     Accordingly, Plaintiff, on behalf of Beyond Meat, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Beyond Meat under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Beyond Meat.

125.     Beyond Meat claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

126.     Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public

statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Beyond Meat securities during the Relevant Period.

127.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Beyond Meat securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

128.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

129.    The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

130.    When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Beyond Meat, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

131.    Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Beyond Meat were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable

to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Beyond Meat.

**Allegations Regarding the Securities Action Defendants as Control Persons**

132.     In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Beyond Meat in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

133.     The Securities Action Defendants were "controlling persons" of Beyond Meat within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action.  Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

134.     Plaintiff hereby derivatively claims such right of contribution on behalf of Beyond Meat.

**COUNT III**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

135.     The Individual Defendants owed and owe Beyond Meat fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Beyond Meat the highest obligation of good faith, loyalty, and due care.

136.     The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Beyond Meat shareholders materially misleading and inaccurate information through the Company's SEC

41

filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

137.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Beyond Meat to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Beyond Meat and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

138.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

139.    Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## COUNT IV

**Against the Insider Selling Defendants for Breach
of Fiduciary Duties for Insider Trading and Misappropriation of Information**

140.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    The Insider Selling Defendants, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public.  These Defendants participated in the scheme to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

142.    This proprietary, non-public information concerning the Company's business and prospects was known by Defendants who sold large quantities of their shares throughout the

Relevant Period and was done for their own self-interests, at the expense of Beyond Meat and the investing public.

143.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

144.    As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from the sales of their stock in Beyond Meat.

## COUNT V

### Against the Securities Action Defendants for Unjust Enrichment

145.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    By his wrongful acts and omissions, the Securities Action Defendants were unjustly enriched at the expense of and to the detriment of Beyond Meat.

147.    The Securities Action Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Beyond Meat.

148.    Plaintiff, as a shareholder and representative of Beyond Meat, seeks restitution from the Securities Action Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Securities Action Defendants from their wrongful conduct and breaches of fiduciary duty.

149.    Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Waste of Corporate Assets

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

152.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

153.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

154.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Beyond Meat and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Beyond Meat the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Beyond Meat and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply

with applicable laws and to protect Beyond Meat and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

    (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

    (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.    Determining and awarding to Beyond Meat exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.    Awarding Beyond Meat restitution from Defendants, and each of them;

F.    Awarding Beyond Meat Contribution from the Securities Action Defendants, and each of them;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 8, 2023

Respectfully submitted,

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
1204 N. King Street
Wilmington, DE 19801
(302) 803-4600
rernst@bk-legal.com

OF COUNSEL:

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*